Jean FAWCETT, Petitioner,

v.

Colin MCROBERTS and Tammy McRoberts, Respondents.

Civil Action No. 601CV0059.

United States District Court, W.D. Virginia.

Oct. 11, 2001.

Victor S. Skaff, III, Gentry, Locke, Rakes & Moore, Roanoke, VA, Stephen J. Cullen, Jamison G. White, Miles & Stockbridge, PC, Towson, MD, for Jean Fawcett.

Colin McRoberts, Bedford, VA, pro se.

Tammy McRoberts, Bedford, VA, pro se.

## OPINION

MOON, District Judge.

### I. INTRODUCTION

On Tuesday, September 25, 2001 at 11:00 am, this Court convened an emergency ex parte hearing to consider two Petitions filed pursuant to the Convention on the Civil Aspects of International Child Abduction ("Convention," "Hague Conven-

tion," or "Treaty"), T.I.A.S. No. 11670, 1988 WL 411501 (Treaty), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601, *et seq.* (West 2001). That morning, Petitioner Jean Fawcett ("Ms.Fawcett"), through Counsel, submitted to this Court a Petition for Return of Child to Petitioner and a Petition for Immediate Issuance of Show Cause Order to Respondents.

At the end of the hearing, the Court concluded that Petitioner had presented a prima facie case that her former husband, Colin McRoberts ("Mr. McRoberts"), wrongfully abducted their son, Travis McRoberts ("Travis"), from Scotland to Bedford, Virginia, with the assistance of his current wife, Tammy McRoberts ("Mrs. McRoberts"). Mr. McRoberts and Ms. Fawcett were divorced in 1998.

Following the ex parte hearing, the Court ordered the U.S. Marshals to find Travis, his father, and step-mother, take them into custody, and present them to the Court for an initial hearing scheduled for 3:30 that afternoon.[1] Upon learning that the McRobertses would be appearing pro se, the Court, *sua sponte*, obtained Counsel for the McRobertses for the sole purpose of assisting them with that afternoon's hearing. The Court heard arguments from both Counsel, listened to testimony from Mr. McRoberts, and scheduled another hearing for Tuesday, October 2, 2001, to address the merits of Ms. Faw-

cett's Petition for Return of Child.[2] The McRobertses chose not to retain Counsel.

In the meantime, the Court ordered the McRobertses, under penalty of Contempt, to remain within its Jurisdiction. The Court further ordered the McRobertses not to remove Travis from its Jurisdiction and to provide him with immediate, reasonable telephone access to his mother. The Bedford County Department of Social Services agreed to assist the Court in ensuring their compliance with the Court's Order by providing ongoing supervision of the Respondents.

At the October 2nd hearing, the Court heard arguments from both Mr. McRoberts (appearing pro se) and Counsel for Ms. Fawcett, received evidence from both parties, and listened to testimony from Mr. McRoberts.

## II. FACTS

Travis Colin Patrick McRoberts was born in Scotland on January 3, 1994. His mother, now known as Jean Fawcett, and his father, Colin McRoberts, were married on September 20, 1986 in Dalmellington, on the upper end of Scotland's Doon Valley.[3] The couple later divorced on November 20, 1998.

The Decree of Divorce required that Melody and Travis live with Mr. McRoberts (under "a Residence Order") and that Ms. Fawcett maintain contact with the children on the weekends (under "a Con-

---

**1.** 42 U.S.C. § 11604 provides:

In furtherance of the objectives of article 7(b) and other provisions of the Convention, and subject to the provisions of subsection (b) of this section, any court exercising jurisdiction of an action brought under section 11603(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition.

**2.** *See Zajaczkowski v. Zajaczkowska,* 932 F.Supp. 128 (D.Md.1996) (treating a petition filed pursuant to the Hague Convention and ICARA as a petition for the writ of habeas corpus, and ordering respondent to show cause as to why child should not be returned).

**3.** In addition to Travis, Ms. Fawcett and Mr. McRoberts also had a daughter, Melody Jean Fawcett McRoberts, who was born on May 8, 1990.

tact Order"). While Travis and Melody were required to live with Mr. McRoberts, they were also required to have "contact" with Ms. Fawcett on weekends, "from Friday at 6.00 p.m. until Monday at 9.00 a.m." In addition, the court also ordered "contact" between the children and Ms. Fawcett, "for two weeks during the school summer holidays, one week during the October holidays, one week during the Easter holiday and one week at Christmas at times to be agreed between the parties as same fits in with [Mr. McRoberts'] shift pattern."

The months both preceding and following the divorce itself were litigious ones. For more than three years, Travis and Melody's parents waged numerous legal battles before the local sheriff court over who would have custody, visitation, and contact rights concerning Melody and Travis, and who should and should not live in the martial home. Mr. McRoberts has alleged, and Counsel for Ms. Fawcett has not contested, that, prior to the divorce, the sheriff court enjoined Ms. Fawcett from "molesting [Mr. McRoberts] by abusing him verbally, by threatening him and thereby putting him into a state of fear and alarm or distress...." Mr. McRoberts' testimony and a subsequent order of the sheriff court revealed that Travis lived with Mr. McRoberts and Ms. Fawcett's maintained rights of rights of supervised contact with Travis "every second Saturday between 10 a.m. and 5 p.m." A subsequent order of June 23, 2000 appears to have expanded her contact with Travis; it granted:

> [T]o the Defender contact *ad interim* with the child TRAVIS COLIN PATRICK McROBERTS, born 3 January 1994 on a four weekly cycle commencing 24 June 2000 as follows:—(Week 1) no contact to take place, (Week 2) residential contact from 3.00 p.m. on Friday until 5 .00 p.m. on Sunday, said child to be collected at school by the person on behalf of the Defender, (Week 3) no contact to take place, and (Week 4) contact from 10.00 a.m. until 5.00 p.m. on Saturday; Sists the cause to monitor contact.

In February of this year, Mr. McRoberts and Ms. Fawcett were again embroiled in another court proceeding regarding Travis, including an "oral Motion for interim interdict to prevent [Mr. McRoberts] from removing the children Melody McRoberts and Travis McRoberts ... from Scotland to the United States of America." On February 15, Mr. McRoberts, himself a police officer, "gave an undertaking" to sheriff court that he would not remove either Travis or his sister from Scotland to the United States.

Mr. McRoberts later broke his word.

At some time between his February 15 undertaking and March 29, 2001, Mr. McRoberts left with Travis and brought him to the United States. The Scottish authorities discovered his flight when Mr. McRoberts failed to appear for a scheduled court hearing on these matters. On March 29, 2001, the sheriff court in Ayr held:

> that [Mr. McRoberts] has (1) unlawfully and wrongly removed the child TRAVIS COLIN PATRICK McROBERTS, born 3 January 1994 outwith the jurisdiction of this Court without the express permission of [Ms. Fawcett] in Contravention of her parental rights in terms of Sections 2(3) and 2(6) of the Children Scotland Act 1995; (2) failed to attend the diets of this Court on 26 and 29 March 2001 without an acceptable excuse; (3) removed the child TRAVIS COLIN PATRICK McROBERTS, born 3 January 1994, from the jurisdiction of this Court by taking him to the United States of America in breach of a specific

undertaking given and recorded in the Interlocutor of 15 February 2001 not to do so pending determination of the present proceedings; and (4) Continues to retain the said child TRAVIS COLIN PATRICK McROBERTS, born 3 January 1994 in the United States of America without disclosing his present whereabouts thereby depriving [Ms. Fawcett] of lawful contact with the said child.

The court further found Mr. McRoberts in contempt, fined him £2000, and authorized his arrest.

Sometime later, perhaps in April, Mr. McRoberts moved to Bedford, Virginia with his current wife, Tammy, their son Tyler, and Travis. The McRobertses now own property in Bedford, and Travis attends the local elementary school. Today, Ms. Fawcett lives with Melody in Ayr; Mr. McRoberts did not bring her to America, he says, because she wanted to remain in Scotland with her mother.

The McRobertses have gone to considerable lengths to conceal Travis not only from the Scottish courts, but also from any contact with his mother, Ms. Fawcett. After fleeing Scotland in a furtive breach of his undertaking, Mr. McRoberts established a post office box in Pennsylvania. Evidently, Mr. McRoberts feared that Ms. Fawcett would discover his and Travis' whereabouts. In a July, 2001 letter to his daughter, Melody, Mr. McRoberts wrote, "We are really worried about what might happen if we give out our address, so I have arranged for a post-box for you to write to us. . . . This is not near where we live, but the letters will get to us."

Until the days following this Court's Order of September 26, 2001, Travis had no contact with his mother since he left Scotland in the spring. He neither had visited her, nor talked with her, nor had any other contact with her—with the exception of one letter he wrote sometime in July. It read, "Dear Mum and Melady, I Love I hope I see you agen. I have I faver can you find my big tank and my soldiers plese."

## III. JURISDICTION

In 1980, various Nations, including the United States and Great Britain, agreed to the Hague Convention; eight years later, Congress implemented the Treaty by passing ICARA. *See* Hague Convention, 1988 WL 411501, at *1; 42 U.S.C. § 11601, *et seq.* According to its findings, Congress enacted the Treaty to establish "legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights." 42 U.S.C. § 11601(a)(4). To achieve these ends, district courts of the United States have been granted original jurisdiction over actions arising under the Hague Convention. 42 U.S.C. § 11603.

Ms. Fawcett's Petition for Return of Child, therefore, is properly before this Court.

## IV. ANALYSIS

The Court begins with the plain language of the Treaty and its implementing legislation. *See United States v. Alvarez–Machain,* 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning.") Both the Treaty and ICARA require the inquiry into a child abduction claim to be a narrow one. Indeed, Congress provides that courts are empowered "to determine only rights under the Convention and not the merits of any underlying child custody claims ." 42 U.S.C. § 11601(b)(4). Similarly, Article 19 of the Treaty cautions that, "[a] decision under this Convention concerning the return of

the child shall not be taken to be a determination on the merits of any custody issue." *See* Hague Convention, 1988 WL 411501 (Treaty), at *5; *see also Miller v. Miller*, 240 F.3d 392, 398 (4th Cir.2001) (citing *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir.1999); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir.1996) ("*Friedrich II* ")).[4]

■ Mindful of these obligations, the Court must determine whether Ms. Fawcett can establish, by a preponderance of the evidence, that Travis was "wrongfully removed or retained within the meaning of the Convention." *See* 42 U.S.C. § 11603(e)(1)(A); *Miller*, 240 F.3d at 398. To meet this standard, Ms. Fawcett must prove that (1) Travis was "habitually resident" in Scotland immediately before Mr. McRoberts removed him to the United States; (2) that Travis' removal was in breach of the "rights of custody" of "a person, an institution or any other body," and (3) that those rights "were actually exercised at the time of removal or would have been so exercised in the absence of his removal." *See* Hague Convention, art. 3, 1988 WL 411501, at *2; *see also Miller*, 240 F.3d at 398.

### IV. A. 1. Habitual Residence

There should be no doubt that, at the time immediately preceding his removal to the United States, Travis McRoberts was "habitually resident" in Scotland. While the Hague Convention does not itself define what it means to be "habitually resident," the Fourth Circuit and other courts have concluded that the term refers to a child's customary residence prior to his removal. *See Miller*, 240 F.3d at 400 (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (1993) ("Friedrich I") (citing *In re Bates*, No. CA 122.89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989), *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir.1995))). Although this inquiry necessarily proceeds on a case-by-case basis, *see Id.* (citations omitted), it focuses not upon a child's domicile, or legal residence, but where he physically lived for "an amount of time sufficient for acclimitization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans–Feder*, 63 F.3d 217, 224 (3d Cir.1995).

Other than taking occasional vacations with his family, Travis lived his entire life in Scotland prior to the date of his removal. He was born in Scotland on January 3, 1994, and lived at different addresses within the town of Ayr for at least the past five years. Travis attended school in Scotland and was also a subject of numerous Scottish court proceedings, such as Mr. McRoberts and Ms. Fawcett's 1988 divorce, other visitation hearings, and the most recent litigation, during which Mr. McRoberts fled.

Because the evidence clearly demonstrates that Travis continuously resided in Scotland from the time of his birth to the date of his removal, the Court holds that he was "habitually resident" in Scotland for the purposes of the Hague Convention.[5]

---

**4.** *See also In re Morris*, 55 F.Supp.2d 1156, 1160 (D.Colo.1999); *Currier v. Currier*, 845 F.Supp. 916 (D.N.H.1994); *Meredith v. Meredith*, 759 F.Supp. 1432, 1434 (D.Ariz.1991).

**5.** Mr. McRoberts may not argue successfully that Travis should be considered a "habitual resident" of the United States for the purposes of the Convention. In *Miller*, the

Fourth Circuit noted that a parent can not create a new habitual residence by wrongfully removing and sequestering a child. *Miller*, 240 F.3d at 400 (citing *Diorinou v. Mezitis*, 237 F.3d 133, 141–42 (2d Cir.2001)). Indeed, the Convention refers to the question of habitual residence in the context prior to "removal or retention," and "any breach of custody or access rights." Hague Convention, art. 3 &

## IV. A. 2. Custody Rights and the Exercise Thereof

 In order for Ms. Fawcett to prevail, she must satisfy the two remaining elements of Article 3: whether Travis' removal was in breach of "rights of custody" of "a person, an institution or any other body," and whether those rights "were actually exercised at the time of removal or would have been so exercised in the absence of his removal." *See* Hague Convention, art. 3, 1988 WL 411501, at *2; *see also Miller*, 240 F.3d at 398.

To answer these questions, the Court must determine whether these rights existed in the country where the child was "habitually resident" prior to his removal. *See* Hague Convention, art. 3, 1988 WL 411501, at *2. "Rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *See Id.*, art. 5, 1988 WL 411501, at *2. These rights may arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *See Id.*, art. 3. The Convention, therefore, broadly defines "rights of custody;" its accompanying report states that " 'the law of the child's habitual residence is invoked in the widest possible sense,' and the sources from which custody rights derive are 'all those upon which a claim can be based within the context of

the legal system concerned.' " *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir.2000).[6] Indeed, the rights in the country in which the child is habitually resident may be broader than those in the country where the abduction case is adjudicated,[7] and courts may take notice of these rights "without recourse to the specific procedures for the proof of that law...." *See Id.*, art. 14, 1988 WL 411501, at *5.

In this case, therefore, the Court must determine whether "a person, an institution or any other body" under Scots law had "rights of custody" relating either "to the care of" Travis, or to his place of residence. The Court holds that both Ms. Fawcett and the sheriff court of Ayr, Scotland had such "rights of custody."

The Children (Scotland) Act, 1995, c. 36 (Scot.) ("the Act" or "Act"), grants parents multiple rights to ensure that they fulfill their parental responsibilities to their children. Act, § 2. These rights include the right "to have the child living with him *or otherwise to regulate the child's residence* " and "if the child is not living with him, *to maintain personal relations and direct contact with the child on a regular basis.*" Act, § 2(a), (c) (emphasis added). Indeed, the Act undoubtedly echoes the language of the Convention when it provides that "no person shall be entitled to remove a child habitually resident in Scotland without the consent" of "a person (whether or not a parent of the child) who for the time being has and is exercising in

---

4, 1988 WL 411501, at *2. The Convention mentions it in no other context. Therefore, even if this Court, *arguendo*, were to find that Mr. McRoberts did not *wrongfully* remove Travis, the Convention allows this Court to consider a "removal"—not only a "wrongful removal"—when determining what constitutes a habitual residence

**6.** Quoting Elisa Perez–Vera, Explanatory Report: Hague Conference on Private International Law, ¶ 84, in 3 Acts and Documents of the Fourteenth Session 426, 451–52. Perez–

Vera authored the report which "is recognized by the [Hague] Conference as the official history of and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10494, 10503 (1986).

**7.** See the Court's discussion of the applicability of *Croll v. Croll*, 229 F.3d 133 (2d Cir. 2000), *infra*.

relation to him" one of the two rights mentioned immediately above. Act, § 2(3), (6).[8] These parental rights arise "by operation of law" (in the words of the Convention) of the U.K. and "relate to the care of the person of the child, and in particular, the right to determine the child's place of residence." As a result, the Children (Scotland) Act 1995 grants "rights of custody" cognizable under the Hague Convention.

Although not one court order produced to this Court has granted Mr. McRoberts "custody" over Travis, the Court assumes, *arguendo*, that the Scottish courts may have granted Mr. McRoberts physical custody of Travis, subject only to limited visits with Ms. Fawcett.[9] Even so, this access, no matter how constrained, is nev-

ertheless among the parental rights given to Ms. Fawcett by the Children (Scotland) Act. This American Court may not look into the merits of an underlying custody or access claim; only a Scottish court may answer the question of whether Mr. McRoberts' physical custody of Travis should foreclose from Ms. Fawcett her parental rights under Scots law,[10] and, therefore, her "rights of custody" under the Convention.[11] In the words of the Hague Convention, Ms. Fawcett is entitled to "the right to determine the child's place of residence." In the similar words of the Children (Scotland) Act, Ms. Fawcett is entitled to "regulate [her] child's residence," as well as to "maintain personal relations and direct contact with" Travis "on a regular basis."[12]

8. The relevant portions of the Children (Scotland) Act 1995 read *in toto:*

2.—(1) Subject to section 3(1)(*b*) and (3) of this Act, a parent, in order to enable him to fulfil his parental responsibilities in relation to his child, has the right—

(*a*) to have the child living with him or otherwise to regulate the child's residence

. . .

(*c*) if the child is not living with him, to maintain personal relations and direct contact with the child on a regular basis. . . .

(3) Without prejudice to any court order, no person shall be entitled to remove a child habitually resident in Scotland from, or to retain any such child outwith, the United Kingdom without the consent of a person described in subsection (6) below. . . .

(6) The description of a person referred to in subsection (3) above is a person (whether or not a parent of the child) who for the time being has and is exercising in relation to him a right mentioned in paragraph (*a*) or (*c*) of subsection (1) above; except that, where both the child's parents are person so described, the consent required for his removal or retention shall be that of them both.

9. The court does note, however, that Ms. Fawcett's rights toward Travis constituted considerably more than limited visits.

10. With respect to Petitions under the Hague Convention, "care must be taken to avoid imposing American legal concepts onto another culture." *See Whallon,* 230 F.3d at 456.

11. § 11 of the Children (Scotland) Act provides that the sheriff court may issue "an order depriving a person of some or all of his parental responsibilities or parental rights in relation to a child." Neither Mr. McRoberts nor Counsel for Ms. Fawcett has offered any evidence that the sheriff court in Ayr has deprived Ms. Fawcett of her parental rights. In fact, the contempt order of March 29 stated that Travis' abduction was "in Contravention of her parental rights."

12. Ms. Fawcett also has "parental rights," albeit undefined, with respect to Travis that arise simply as a result of her being his mother. § 3(1)(a) of the Act provides that "a child's mother has parental responsibilities and parental rights in relation to him whether or not she is or has been married to his father. . . ." Since these rights appear in a section of the Act different from § 2, they are likely separate and independent from the rights discussed above, and therefore provide her an alternative basis for relief.

Mr. McRoberts' own actions betray his tacit understanding of Ms. Fawcett's parental rights under § 2(3) of the Act. On February 15, 2001, Mr. McRoberts undertook to the sheriff in Ayr not to remove Travis to the United States. By doing so, he acceded to the provisions of the Act which forbid one parent from removing a child from Scotland without the consent of the other parent. After having once submitted to the Act's jurisdiction, Mr. McRoberts may not now in good faith deny that the Act applies to Ms. Fawcett's rights of custody.[13]

The Court also believes that Travis was the subject of the rights of custody "attributed to . . . an institution," *see* Hague Convention, art. 3, 1988 WL 411501, at *2, as well as to Ms. Fawcett. During the years following Mr. McRoberts and Ms. Fawcett's 1998 divorce, Travis was the subject of numerous court proceedings concerning his physical custody, visitation rights, and contact with his parents. In fact, at the very time Mr. McRoberts removed Travis from Scotland, he did so both in the midst of one such proceeding and in breach of his specific undertaking not to do so. As a result, the sheriff in Ayr found Mr. McRoberts in contempt, levied a £2000 fine against him, and authorized his arrest. Since the Convention provides that "rights of custody" shall include "rights relating to the care of the person of the child," *See* Hague Convention, art. 5, 1988 WL 411501, at *2, there is no doubt that the sheriff court in Ayr (an "institution"), in convening proceedings concerning Travis' custody, was an "institution" which also possessed "rights of custody" with respect to "the care of" Travis. As already noted, by participating in the sheriff court proceedings and by undertaking not to re-

move Travis, Mr. McRoberts understood the role of the sheriff court in adjudicating the dispute between himself and his former wife, and can not now deny its interest in this case.

While the question of whether a court has been held to have "rights of custody," appears not to have been addressed in the courts of United States, it has been before the tribunals of our co-signatory Nations. Because the "opinions of our sister signatories [are] entitled to considerable weight," *Air France v. Saks*, 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), this Court turns to the House of Lords, which recently held that a court may possess "rights of custody."

The analogous case of *In Re H.(A Minor)*, [2000] 2 A.C. 291, 1999 WL 1319095(HL), arose from a dispute in County Cork, in the Republic of Ireland. A father, living in the Republic, petitioned the District Court of Carrigaline for "guardianship [of] and access" to his child. 2 A.C. at 300. The mother (also living in Ireland) and the father both agreed that, pending the district court's decision, the father should be given access to H. "during the daytime on each Saturday and Sunday in the meantime," *Id.*, and the mother "day-to-day" care of H. at her address. *Id.* at 305. Despite this agreement, the mother left Ireland with H. and settled in England. *Id.* at 300. In her absence, the Irish court appointed the father as a guardian and granted him access "to that child from 10 a.m. each Saturday until 6 p.m. each Sunday." *Id.* at 301.

Given the pending nature of the guardianship and access proceedings, the House of Lords concluded that the Irish district court did have "rights of custody" with

---

**13.** At the October 2nd Evidentiary Hearing, Mr. McRoberts admitted that were he to return to Scotland, he would be prevented from leaving—presumably because of the sheriff court contempt order.

respect to the child,[14] and that those rights were breached by H.'s mother when she departed Ireland. Likewise, in the case at bar, questions concerning the rights of custody and access were pending before the sheriff court in Ayr. In addition, the Court assumes *arguendo* that Mr. McRoberts also had "day-to-day care" of Travis at his address when he decided to flee the country. In its contempt order, the Ayr court held that Mr. McRoberts removed Travis "in breach of a specific undertaking not to do so *pending determination of the present proceedings ....*" (emphasis added). As the Irish court possessed rights of custody with respect to H., so too does the sheriff court at Ayr have rights of custody with respect to Travis. Moreover, as a House of Lords decision, *In Re H. (A Minor)* not only assists this Court in interpreting the Hague Convention, it also binds the Scottish court in Ayr, and effectively grants it the authority to maintain "rights of custody" of Travis McRoberts.[15]

\* \* \* \* \* \*

Were Mr. and Mrs. McRoberts represented by Counsel, they most certainly would have invited this Court to follow *Croll v. Croll*, 229 F.3d 133 (2d Cir.2000),

the facts of which are analogous to the case at bar, and in which the Petitioner was held not to have "rights of custody" of his abducted child, but rather "lesser rights of access." However, because (1) the Fourth Circuit in *Miller* instructs this Court to interpret the Hague Convention in accordance with both its plain language and its purpose, and (2) the facts of this matter are distinguishable from *Croll,* this Court would decline the invitation to apply *Croll* to this case.

In *Croll,* Stephen Croll sought an order compelling his wife, Mei Yee Croll, to return their minor child, Christina, to Hong Kong pursuant to the Hague Convention. *Croll,* 229 F.3d at 134. During or attendant to the divorce proceedings between Mr. and Mrs. Croll, the Hong Kong court issued a custody order which granted Mrs. Croll " 'custody, care and control' " of Christina and granted "Mr. Croll a right of 'reasonable access.' " *Id.* at 135 (citation omitted). The custody order also contained a *ne exeat* clause, which directed that Christina "not be removed from Hong Kong until she attain[ed] the age of 18 years" without leave of court or consent of

---

**14.** Lord Mackay of Clashfern stated:

In this case the mother had been awarded custody by consent but as Thorpe L.J. said it was implied in the consent as appears from the terms relating to access that the day-to-day care of the child would be exercised at the mother's address given in the application. Once the father had appointment as guardian he had an equal right with the mother to determine where the child should live and in particular whether the child should be removed from the jurisdiction [of] the courts of Ireland. I do not regard the award of custody by consent in proceedings which were still pending in which active consideration of an application for guardianship by the father was taking place at the time of removal as destructive of the court's power to decide the place of the child's residence. In these circumstances I conclude that the district

court of Carrigaline had rights of custody in respect of H. at the time of her removal and that these rights were being exercised by reason of the pending application of her father to be appointed her guardian.

*In Re H. (A Minor),* 2 A.C. at 305.

**15.** Briefing papers of the British House of Lords state, "The House of Lords is the highest court in the land—the supreme court of appeal. It acts as the final court on points of law for the whole of the United Kingdom in civil cases, and for England, Wales, and Northern Ireland in criminal cases. Its decisions bind all courts below." *The Judicial Work of the House of Lords,* available at http://www.publications.parl ia-ment.uk/pa/ld199697/ldin-fo/ld08judg/ld08judg.htm. (last visited Oct. 3, 2001).

the other parent. *Id.* In April, 1999, Mrs. Croll brought Christina to New York with the alleged intention of visiting schools, and eventually decided to keep her there. *Id.*

In ruling against the petitioner, the *Croll* court cited *Black's Law Dictionary, Webster's Third International Dictionary,* and the *Random House Dictionary of the English Language* for the proposition that "custody of a child entails the primary duty and ability to choose and give guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things." *Croll,* 229 F.3d at 138. The court concluded that "custody entails care," and "is something other and more than a negative right or veto," *Id.,* and that "[n]othing in the Hague Convention suggests that the drafters intended anything other than this ordinary understanding of custody." *Id.* at 139.[16]

This Court disagrees.

To find a definition of "rights of custody" under the Hague Convention, the Court need search no further than the Hague Convention itself—a treaty in which the definition of "right of custody" is doubtless broad enough to encompass not only the American notions of custody rights to which the *Croll* court refers, but also the rights of Ms. Fawcett and the Scottish court in this case. The plain language of the Treaty is clear: it provides that "rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." The plain language of the Children (Scotland) Act is also clear: a parent has the right "to regulate the child's residence." As this Court has already demonstrated, under the Convention and Scots law, both Ms. Fawcett and the sheriff court in Ayr possess these rights. Moreover, these rights are not negative nor mere veto rights; they are affirmative grants of custody rights under Scots law. Indeed, by giving his undertaking not to remove Travis from Scotland to the United States, Mr. McRoberts evidenced his own understanding of these rights.

In *Miller,* the Fourth Circuit noted that the primary purpose of the Hague Convention is " 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.' " 240 F.3d at 398 (quoting *Friedrich I,* 983 F.2d at 1400). Denying Ms. Fawcett or the sheriff court their lawful custody rights would not only disrupt *pending* proceedings in Scotland, it would also result in a de facto judgment on the merits for Mr. McRoberts. Article 3 of the Convention forbids such an outcome. *See Miller,* 240 F.3d at 398 ("[t]he merits of any underlying custody case are not at issue" (citations omitted)).

In addition, to interpret Ms. Fawcett's rights as constituting something less than "rights of custody" would eviscerate anoth-

---

16. In finding for the Petitioner, the *Croll* court differentiated between "rights of custody" and "rights of access," *Croll,* 229 F.3d at 137, the former of which is discussed above, and both of which are discussed in the Treaty. The Convention defines "rights of access" in Article 5 to "include the right to take a child for a limited period of time to a place other than the child's habitual residence." *See* Hague Convention, 1988 WL 411501, at *2. The Convention also provides that the signa-

tory states "shall take steps to remove, as far as possible, all obstacles to the exercise of such rights." *See Id.,* art. 21, at *5.

The *Croll* court concluded that Stephen Croll's rights "were properly classified as rights of access." 229 F.3d at 143. Since this Court concludes that Ms. Fawcett and the Ayr court do have "rights of custody"of Travis within the meaning of the Convention, it need not address whatever "rights of access" Ms. Fawcett may have.

er fundamental object of the Convention: "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting State." *See* Hague Convention, art. 1, 1988 WL 411501, at *1, see also *Croll*, 229 F.3d at 144, *et seq.* ("In my view, the majority seriously misconceives the legal import of the *ne exeat* clause, and in so doing, undermines [this goal]." (Sotomayor, Circuit Judge, dissenting)). The Fourth Circuit echoes this notion, where it notes that " 'American courts will normally accord deference to foreign adjudications as a matter of comity,' " and that "comity is at the heart of the Hague Convention." *Miller* 240 F.3d at 400 (quoting *Diorinou*, 237 F.3d at 142–3.)

Finally, the facts of *Croll* are distinguishable from the case at bar. For instance, while the Hong Kong order gives Mrs. Croll "custody, care and control" over her daughter, not one sheriff court order produced by Mr. McRoberts characterizes the relationship between Mr. McRoberts and Travis (or Melody) as one of "custody" or "custodial." In contrast, the Ayr Divorce Decree of November 20, 1998 states that it is "[m]aking a Residence Order in respect of MELODY . . . and TRAVIS . . . requiring that they live with the pursuer." This language certainly falls short of the Hong Kong order's "custody, care, and control" provision.

Furthermore, the Hong Kong court order granting custody to Mrs. Croll was a final, not temporary, order. *Croll*, 229 F.3d at 143. In this case, the litigation concerning Travis was far from final. From the 1998 Divorce Decree to this spring, the sheriff court issued multiple orders altering contact, custody, and visitation parameters concerning Travis. In this case, Mr. McRoberts departed Scotland in the midst of pending proceedings in which the only order issued was not final, but one holding Mr. McRoberts in contempt. Given the continuing nature of the proceedings, the sheriff court still maintained jurisdiction over all parties, and thus "rights of custody" over Travis. In *Croll*, had the Hong Kong order not been final, perhaps the court would have considered the question of whether the Hong Kong court had any rights of custody over Christina.

\* \* \* \* \* \*

Having held that both Ms. Fawcett and the sheriff court possessed "rights of custody" with respect to Travis McRoberts at the time of his removal, this Court now asks whether either one exercised these rights prior to his removal, or would have done so absent his removal. Given the Scottish order of March 29, 2001, there is no doubt that the sheriff court at Ayr was exercising "rights of custody" with respect to Travis prior to his removal—Mr. McRoberts absconded with Travis in the midst of the court's proceedings after making a undertaking to the contrary. Similarly, Ms. Fawcett was also exercising her "rights of custody" of Travis. The Scottish court held that Mr. McRoberts removed Travis "in Contravention of her parental rights in terms of Sections 2(3) and 2(6) of the Children Scotland Act 1995." As a party to the ongoing litigation in Ayr, Ms. Fawcett was attempting to exercise her rights pursuant to the Act.

This Court, therefore, concludes that (1) Travis was "habitually resident" in Scotland immediately before Mr. McRoberts removed him to the United States; (2) that Travis' removal was in breach of rights of custody of both his mother, Ms. Fawcett, and the sheriff court in Ayr, and (3) that those rights "were actually exercised at the time of [Travis'] removal."

As a result, this Court holds that, by a preponderance of the evidence, Mr. McRoberts wrongfully and unlawfully removed

Travis from Scotland within the meaning of the Hague Convention.

### IV. B. Applicable Defenses [17]

■ Mr. McRoberts is not without potential defense. To defeat Ms. Fawcett's Petition, the Convention requires Mr. McRoberts to establish one of four available defenses set forth in Articles 13b or 20. *See Miller*, 240 F.3d at 398–99. In order to prevail, Mr. McRoberts must demonstrate, by clear and convincing evidence, that (1) there was a grave risk that Travis' return to Scotland would expose him to physical or psychological harm or otherwise place him in an intolerable situation, *see* Hague Convention, art. 13b, 1988 WL 411501, at *5, or (2) the return of Travis to Scotland would not be permitted by the fundamental principles of the United States "relating to the protection of human rights and fundamental freedoms[,]" *Id.*, art. 20, 1988 WL 411501, at *6. *See also Miller*, 240 F.3d at 398–99. Alternatively, Mr. McRoberts could prevail should he establish, by a preponderance of the evidence, that this action was not commenced within one year of the abduction, *and* that the children were now well-settled in Virginia, *see* Hague Convention, art. 12, 1988 WL 411501, at *5, or that Ms. Fawcett "was not actually exercising the custody rights at the time of removal ... *or* had consented to or subsequently acquiesced in the removal[,]" Hague Convention, art. 13a, 1988 WL 411501, at *4 (emphasis added).

Mindful that these defenses should be construed narrowly, *see Miller*, 240 F.3d at 402 (citing *Friedrich II*, 78 F.3d at 1067),

the Court shall now address each one *seriatim*.

■ Mr. McRoberts must establish the first defense of "grave risk" by clear and convincing evidence. During the evidentiary hearing, Mr. McRoberts offered testimony about the litigation surrounding both the dissolution of his marriage to Ms. Fawcett and questions of Travis' custody. Notwithstanding his egregious lack of candor with the sheriff court in Ayr on February 15, 2001, this Court nonetheless accepts Mr. McRoberts' contention that Ms. Fawcett's fitness to rear her children may be an important question. The Court does note that Ms. Fawcett's access to her son was circumscribed by the Ayr court. The Court further recalls the Order that Ms. Fawcett had to be enjoined from "molesting [Mr. McRoberts] by abusing him verbally, by threatening him and thereby putting him into a state of fear and alarm or distress and by using violence towards him...."

Nevertheless, the duty of this Court is clear: it may not look into the merits of the underlying child custody claim. As the Sixth Circuit observed, and the Fourth Circuit agreed, *see Miller* 240 F.3d at 402:

> In thinking about these problems, we acknowledge that courts in the abducted-from country are as ready and able as we to protect children. If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly.... When we trust the court system in the abducted-from country, the vast majority of the claims of harm—those that do not rise to the level

---

17. While " 'courts retain the discretion to order return even if one of the exceptions is proven,' " *Miller,* 240 F.3d at 398–99 (quoting *Feder,* 63 F.3d at 226 (citing Pub. Notice 957, 51 Fed.Reg. 10,494, 10509 (1986))), this Court will nevertheless consider the merits of each of Mr. McRoberts' potential defenses. *See also* Hague Convention, art. 18, 1988 WL 411501, at *5 ("The provisions of this Chapter [entitled Return of Children] do not limit the power of a judicial or administrative authority to order the return of the child at any time.")

of gravity required by the Convention—evaporate.

(quoting *Friedrich II*, 78 F.3d at 1068 (internal citation omitted)). Given the Scottish sheriff court's experience in matters of family law—let alone its three-year involvement with Mr. McRoberts, Ms. Fawcett, and Travis—Travis most certainly does not face "a grave risk of harm" were he to be returned to Great Britain. Scotland, like Virginia, is home to various social service and child welfare agencies which will work with the Scottish courts to safeguard the best interests of Travis while protecting the parental rights of both Ms. Fawcett and Mr. McRoberts. This Court concludes that Travis would not face a "grave risk" of physical or psychological harm, or be placed in an "intolerable situation." For the same reasons, the Court also concludes that Travis' return to Scotland would not offend fundamental principles of human rights and freedoms. Mr. McRoberts, therefore, can not establish the first two defenses.

Likewise, Mr. McRoberts can not meet the requirements of the second two defenses. First, Ms. Fawcett complied with the one-year statute of limitations. *See* Hague Convention, art. 12, 1988 WL 411501, at *4. Ms. Fawcett filed her Petitions in this Court on September 25, 2001, well within a year of February 15, 2001, the earliest possible date of his removal from Scotland. Second, this Court has already established that Ms. Fawcett "was ... exercising her custody rights at the time of removal" and had never "consented to or subsequently acquiesced in his removal."

The Court, therefore, holds that Mr. McRoberts has no defense to removing Travis from Scotland.

## V. CONCLUSION

This Court does not dispute Mr. McRoberts' contention that he is providing a nurturing environment for Travis in Bedford, Virginia. It is evident that Mr. McRoberts loves his son and wishes to provide for his well-being. Nevertheless, no matter how sincere his intentions may be, Mr. McRoberts may not pursue them in defiance of international, Scottish, and American law.

The courts of Scotland will provide the rightful and most efficient venue to ensure the best interests of Travis while safeguarding the rights of both of his parents.

Because Travis McRoberts was unlawfully and wrongfully removed from Scotland to the United States within the meaning of the Hague Convention, Ms. Fawcett's Petition for Return of Child to Petitioner shall be, and hereby is, GRANTED.

## VI. COSTS

Congress has mandated that Courts which order the return of a child pursuant to a Hague Convention petition shall order the respondent to pay the necessary expenses incurred by or on behalf of the petitioner—unless the respondent can establish that such order would be "clearly inappropriate." 42 U.S.C. § 11607(b)(3). These costs include: "court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child." *Id.*

Because this Court has concluded that Travis McRoberts has been wrongfully removed from Scotland within the meaning of the Convention, the Court hereby ORDERS Petitioner to submit a bill of costs and fees for the instant action no later than 10 days from the issuance of this ORDER. The Court also reserves jurisdiction over further expenses as Respondents may submit.

An ORDER implementing this OPINION is attached hereto.

## ORDER

On September 25, 2001, Jean Fawcett, through Counsel, submitted a Petition for Return of Child to Petitioner. For the reasons stated in the attached OPINION, Ms. Fawcett's Petition shall be, and hereby is, GRANTED. With the kind agreement, cooperation, and assistance of the Bedford County Department of Social Services and the appropriate Scottish child welfare agency, Travis McRoberts shall be taken into custody and returned to the jurisdiction of the sheriff court, Ayr, Scotland, FORTHWITH.

In addition, because this Court has concluded that Travis McRoberts has been wrongfully removed from Scotland within the meaning of the Convention, the Court hereby ORDERS Petitioner to submit a bill of costs and fees for the instant action no later than 10 days from the issuance of this ORDER.

It is so ORDERED.

The Clerk of the Court is hereby directed to send certified copies of this ORDER and OPINION attached hereto to all Counsel of record, as well as to: (a) the Bedford County Department of Social Services, (b) Mr. John Overstreet, Bedford County Attorney, and (c) the clerk of the sheriff court of Ayr, Scotland, United Kingdom.