Jonathan M. FREIER, Plaintiff,

v.

Judith D. FREIER, Defendant.

No. 96–CV–73967–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 4, 1996.

Prather & Associates, P.C. by Jan Rewers McMillan, Detroit, MI, for Plaintiff.

Nicole S. Leveque, Southfield, MI, for Defendant.

### ORDER GRANTING PETITION FOR RETURN OF MINOR CHILD TO ISRAEL

HOOD, District Judge.

#### I. BACKGROUND/FACTS:

This matter is before the Court on the Complaint and Petition by Jonathan M. Frei-er for Return of Minor Child, Avital Freier, to Ra'anana, Israel, her habitual residence. The Complaint is brought against Judith D. Freier, the mother, under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.*, and the Hague Convention of the Civil Aspects of International Child Abduction (the "Hague Convention").

Petitioner Jonathan Freier and Respondent Judith D. Freier are currently married. Both are dual United States and Israeli citizens. They both moved separately to Israel in the late 1970s. In 1987, they returned to Michigan to get married and then returned to Israel to live where they have lived together continuously. Respondent has two children from a prior marriage (Yonathan, 14 and Michal, 11) who also lived with the parties. On June 10, 1992, the couple's only child together, Avital, was born in K'far Sava, Israel. She is now four years of age. Avital has resided in Israel since her birth. Petitioner is self-employed as a marketer of toys. Respondent has been continuously employed since the marriage with various employers. Respondent has vacationed during the summers with her three children at her parents' home in Southfield, Michigan. Petitioner asserts that since their marriage, Respondent has been present in Michigan for approximately 101 days:

   a.  1987:  July 7 through August 18 August 30 through September 4

   b.  1988:  July 6 through August 2

   c.  1990:  July 1 through August 2

   d.  1993:  July 12 through August 12 (3 weeks, 10 days of which were spent in Virginia)

   e.  1995:  July 29 through August 27 (18 days and the balance spent in Virginia, California, England and Germany)

Of the days Respondent has spent in Michigan, Avital, born in 1992, has spent approximately 8 weeks in Michigan: July 12 through August 12, 1993 (less than 10 days spent in Virginia) and 18 days between July 19 through August 27, 1995. After each visit, Respondent would return to Israel in time for the children to begin school.[1]

---

1. The divorce decree between Respondent and    her first husband precludes her from taking their

Avital attended a day care in Israel (Na'amat Day Care Center) from 8:00 a.m. until 4:00 p.m. during work days since she was one year old until she was removed. For the current school year, she was approved to transfer to the public school, Paamonit Kindergarten, across the street from her home. (Exhibit N, Petitioner's Brief).

Avital was born with a hair lip and cleft palate and has been under continuing medical care in Israel since her birth. She has undergone three surgical procedures there to date and has participated in speech therapy for the last six months. The two times Avital has visited Michigan, she was checked by doctors for second opinions.

Avital is an official member of the synagogue Lechu N'ranina in Ra'anana. She has extended family in Israel, including a paternal grandmother, aunts, uncles and cousins. Avital has participated in nature trips with other families between the months of June and October each year.

When Respondent departed Israel on June 30, 1996, she informed Petitioner that she would be vacationing with her parents in Michigan until August 1. The date of return on their tickets was August 1, 1996. Petitioner thought Respondent was just vacationing with her family in Michigan as she had in the past. Petitioner had no idea that Respondent was thinking about not returning home. As a family, they had made plans for the current school year. Avital was expected to attend the public kindergarten. Petitioner asserts that if he had known Respondent was not returning, he would not have willingly let the children go. (Exhibit J, Petitioner's Brief, Petitioner's affidavit).

Respondent asserts that she had begun discussing with Petitioner the possibility of permanently relocating to Michigan in August 1995.[2] Respondent asserts that the parties were having financial difficulties because Petitioner refused to work, leaving Respondent as the primary provider for the family. Respondent also asserts that Petitioner became abusive toward her oldest child, Yonathan, who filed a police report against Petitioner. Petitioner claims that there was never an assault against the children. Yonathan did file a police report complaining that Petitioner did not allow him sufficient time to finish his meals. With Respondent's concurrence, the report was rescinded. (Exhibit J, Petitioner's Brief, Petitioner's Affidavit and Exhibit G, Police Report). Respondent claims that the marriage continued to deteriorate and she continued to state her desire to return permanently to Michigan. Respondent made arrangements for the children and herself to return to Michigan but Petitioner refused to go. However, he allowed the children to leave Israel. Respondent asserts that Petitioner was aware that Respondent was unhappy and wanted to remain in Michigan.

When Respondent arrived in Michigan on July 1, 1996, she called Petitioner to inform him that they had arrived safely, stating that she missed him and was thinking of him. When she did not call again for some time, he telephoned Respondent on or about Wednesday, July 17, 1996. At that time, Respondent informed him that she was not returning to Israel and that she wanted a divorce. Petitioner attempted to dissuade Respondent. She responded by telling Petitioner that she would extend her return tickets until August 14, 1996. To date, Respondent and the children have not returned home.

Respondent asserts that Petitioner had always talked as though the child, Avital, would remain with Respondent. She claims that his real goal is her return. Respondent further asserts that Petitioner filed an action in the Rabbinical Court in Israel requesting that the court enter an order prohibiting Respondent from leaving Israel should she

---

two children abroad for more than 60 days at a time. Respondent was required to post a $30,-000.00 bond for this provision. The father (Mr. Schiachi) of the two older children has apparently also filed an Application for Assistance under the Hague Convention for the return of his two children and has called in the $30,000.00 bond.

**2.** Respondent did not submit any supporting documents or affidavits with her response but Respondent testified at the hearing of this matter.

return. Petitioner responds indicating that Respondent can contest such an action with the Rabbinical Court with a Rabbi as her representative.

On August 19, 1996, Respondent filed a divorce action in Oakland County Circuit Court and obtained an Ex Parte Custody Order for physical custody of Avital.[3] Respondent enrolled her three children in the Akiva Hebrew Day School in Lathrup Village, Michigan. On August 20, 1996, Petitioner filed a Request for Return of Abducted Child with the State of Israel under the Hague Convention. On August 23, 1996, the instant action was filed with the Court pursuant to ICARA and the Hague Convention.

## II. *ANALYSIS:*

### A. *Jurisdiction.*

The United States and Israel are both signatories to the 1980 Hague Convention. The United States Congress ratified the Convention by enacting ICARA. Specifically, Congress made the following declarations:

(b)(1) It is the purpose of this chapter to establish procedures for the implementation of the Convention in the United States.

(2) The provisions of this chapter are in addition to and not in lieu of the provisions of the Convention.

\*    \*    \*    \*    \*    \*

(4) The Convention and this chapter empower the courts in the United States to determine *only rights under the Convention and not the merits of any underlying child custody claims.*

42 U.S.C. § 11601(b)(emphasis added). It is clear from the above-quoted language that this Court has jurisdiction over the matter but only to determine rights under the Convention and not the merits of any underlying child custody claims.

### B. *Article 3 of the Hague Convention.*

Article 3 of the Hague Convention states: The removal or the retention of a child is to be considered wrongful where—

(a) it is in breach of rights of custody attributed to a person ... under the law of the State *in which the child was habitually resident immediately before the removal or retention;* and

(b) at the time of removal or retention *those rights were actually exercised,* either jointly or alone, or would have been so exercised but for the removal or retention.

Art. 3(a) and (b) (emphasis added).

### C. *Standard/Burden of Proof.*

The Sixth Circuit has had an opportunity to address the meaning of "habitual residence" under the Convention. Under the Act, Petitioner has the burden of showing by a preponderance of the evidence that the removal was wrongful. 42 U.S.C. § 11603(e)(1); *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993) (*Friedrich I* ). In order to show wrongfulness: Petitioner must prove by a preponderance of the evidence that: 1) Respondent removed the child from her "habitual residence," and 2) Petitioner was "exercising" his parental custody rights over the child at the time of removal, or that he would have exercised his rights but for the removal, under the law of the child's habitual residence. *Id.* If Petitioner meets the burden, the burden then shifts to Respondent to show one of the four following affirmative defenses: 1) by clear and convincing evidence that there is a grave risk that the return of the child would expose the child to physical or psychological harm (Art. 20, 42 U.S.C. § 11603(e)(2)(A)); 2) by clear and convincing evidence that the return of the child would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (Art. 20, 42

---

**3.** The Petitioner has not been served in the divorce action but intends to file a limited appearance to argue that the state court has no jurisdiction over the matter because Respondent has not been a resident of Michigan for 180 days preceding the filing of the Complaint of Divorce. Also, Petitioner plans to argue that the state court has no jurisdiction over the custody issue pertaining

to Avital under the Hague Convention Treaty, Article 19. Respondent's initiation of the divorce and custody proceedings in the Oakland County Circuit Court can be seen as an effort to seek relief in a court in her "native" land where Respondent may feel she has an advantage. This is the precise behavior the Hague Convention and ICARA seek to curtail.

U.S.C. § 11603(e)(2)(A)); 3) by a preponderance of the evidence that the proceeding was commenced more than one year after the abduction and the child has become settled in his/her new environment (Art. 12, 42 U.S.C. § 11603(e)(2)(B)); or 4) by a preponderance of the evidence that Petitioner was not actually exercising the custody right at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention (Art. 13a, 42 U.S.C. § 11603(e)(2)(B)). *Friedrich I* at 1400.

### D. *Petitioner's Burden.*

#### 1. *Habitual Residence.*

The Sixth Circuit has stated that:

> A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward.

*Friedrich I* at 1401. The Sixth Circuit cited a British Court case, *In re Bates,* No. CA 122.89, High Court of Justice, Family Div'n Ct. Royal Court of Justice, United Kingdom (1989), for the proposition that the focus is on the child and not the parents and that past experience and not future intentions is the test. *Id.*

Here, Respondent's factually unsupported brief asserts that the child had a habitual residence here in Michigan because of the annual visits to Michigan. Respondent also argues that by August 1996, the mother and children were committed to remaining in Michigan and that by the end of the first week of their return, they considered Michigan their home.

The documentary evidence and exhibits submitted by Petitioner, as well as the testimony of the witnesses, indicate that in "looking back in time," the child's "habitual residence" is in Israel. The child was born in Israel. The parents lived continuously in Israel for years prior to the child's birth. Since the child was born, she has visited the United States twice. The child has been attending day care in Israel since she was one-year old. The child was accepted to attend kindergarten in a public school in Israel for this school year. The child has extensive family in Israel.

Respondent cites *Brooke v. Willis,* 907 F.Supp. 57 (S.D.N.Y.1995) for the proposition that it takes only "one day" to change residence. However, that is not the Sixth Circuit rule of law. In addition, in *Brooke,* the child lived 50% of her time with one parent in the United Kingdom and 50% of her time in the United States. Respondent also cites a U.K. case, *In re V* (1995) 2 F.L.R. 992 [4] for the proposition that a residence could be alternated. However, the Sixth Circuit specifically states that "a person can have only one habitual residence." *Friedrich I,* 983 F.2d at 1401. The Sixth Circuit further stated:

> ... habitual residence can be "altered" only by a change in geography and the passage of time, not by changes in parental affection and responsibility. The change in geography must occur before the questionable removal; here, the removal precipitated the change in geography. If we were to determine that by removing Thomas from his habitual residence without Mr. Friedrich's knowledge or consent Mrs. Friedrich "altered" Thomas's habitual residence, we would render the Convention meaningless. It would be an open invitation for all parent who abduct their children to characterize their wrongful removals as alterations of habitual residence.

*Id.* at 1402. *Friedrich I* specifically states that in order to determine habitual residence, one must look back in time. The Convention also specifically states that the child's habitual residence is the residence "immediately before the removal or retention." There is no question here that the child, Avital, has lived predominantly in Israel for most her young life. The amount of time spent in Michigan amounts to vacation time and is inadequate to establish habitual residence. Nor do the facts support an "altered" habitual residence. At best, Avital can be claimed to have resided in Michigan from approximately August 1 or August 14 (the date of the latest return ticket and its extension) until October 1996. While this may be a

4. A copy of the case was not attached to Respondent's brief.

change of geography, it did not occur before the wrongful removal or retention and is not coupled with a sufficient "passage of time." Based on the above-stated facts and *Friedrich I.* the Court finds that the child's habitual residence is in Israel.

#### 2. *Exercise of Parental Custody Rights.*

█ Respondent states in her brief and testimony, that Petitioner had knowledge of her intention to take Avital with her to the United States and permanently reside in the United States. Petitioner asserts in his affidavit that he had no knowledge that Respondent was going to leave him forever and take their daughter with her. Petitioner, in addition to his affidavit, submitted a transcript of the couple's July 31, 1996 telephone conversation to support his argument that Respondent did not plan on leaving for good. (Exhibit N, Petitioner's Brief, p. 2).

The Sixth Circuit on the issue of custody stated:

Under the Convention, whether a parent was exercising lawful custody rights over a child at the time of removal must be determined under the law of the child's habitual residence. Hague Convention, Article 3.

*Friedrich I,* 983 F.2d at 1402. The Sixth Circuit further expanded on this issue in *Friedrich v. Friedrich,* 78 F.3d 1060 (6th Cir.1996) (*Friedrich II*). The Sixth Circuit stated:

... Enforcement of the Convention should not be made dependent on the creation of a common law definition of "exercise." The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.

\*      \*      \*      \*      \*      \*

We therefore hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the

child. *Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.* These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts. 42 U.S.C. § 11601(b)(4). ·

There is no dispute that an Israeli tribunal has not ruled on the custody issue. Petitioner submitted sections 14 and 15 at Israel's Capacity and Guardianship Law. (Exhibit Q, Petitioner's Brief). It states that parents are the natural guardians of their child with the right to custody of the child and the right to determine the child's place of residence. It is clear that Petitioner, as the natural father, has custody over Avital under Israeli law. Since the Israeli tribunal has not ruled on the custody issue, under *Friedrich II,* this Court must liberally construe whether Petitioner has "exercised" his right to those custody rights. There is no serious challenge to Petitioner's custody rights or the exercise of those rights. Petitioner, as noted above, is the child's natural father. Petitioner, Respondent and the children, all lived together continuously in Israel.

Petitioner claims that he has requested for the return of the child via telephone. Petitioner, by filing the instant petition, is further exercising his rights to custody over Avital. Petitioner began this process to seek return of the child just after the child did not return to Israel by the date of the extended airline tickets, August 14. On August 15, he filed an Application for Return of the Child with the Ministry of Justice in Jerusalem. On August 20, he filed a Request for Return of the Child and Divorce Proceedings in the Rabbinical District Court and on August 23, this Complaint and Petition.

Petitioner claims that in various telephone calls with Respondent, he has requested visitation with the child while he is here for the hearing of this matter before this Court. Petitioner has custody rights over Avital and has and is exercising his rights. There has been no abandonment of the child and no judicial termination of Petitioner's rights.

Petitioner has not consented to the removal and retention of the child.

Based on the above, Petitioner has met his burden that the child, Avital, was wrongfully removed from her place of habitual residence and that he has and continues to exercise his custody rights over her.

### E.´ Respondent's Burden/Affirmative Defenses.

#### 1. Grave Risk of Harm.

■ Respondent argues that even if the Court should find that Israel is the habitual residence of the child, the request for return of the child should be denied under the exceptions set forth in Article 13 and Article 20 of the Hague Convention. Article 13 states in pertinent part as follows:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—
>
> (b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The Sixth Circuit has stated that these exceptions must be narrowly construed:

> All four of these exceptions are "narrow," 42 U.S.C. § 11601(a)(4). They are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute. (citation omitted). In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention. (citation omitted).

Friedrich II, 78 F.3d at 1067.

Respondent has not established by clear and convincing evidence that Avital is in grave risk of physical or psychological harm if she were to return to Israel. The Sixth Circuit addressed this issue stating:

> Although it is not necessary to resolve the present appeal, we believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection. Psychological evidence of the sort Mrs. Friedrich introduced in the proceeding below is only relevant if it helps prove the existence of one of these situations. (footnote omitted).

Friedrich II, 78 F.3d at 1069. Respondent claims that separation of the child from her mother and two older siblings (her mother's children from a previous marriage) would cause severe psychological harm and create an intolerable situation. The Sixth Circuit has said that this sort of adjustment problem common in the relocation of most children is not enough. Id. at 1067.

Respondent claims in her brief that the two older children do not wish to return to Israel. She further claims that the child would not be able to be near her grandparents, aunts and uncles who reside in Michigan. The record does not support this. In her own testimony, Respondent admitted the younger of her two older children misses Israel. Respondent also testified that her parents frequently visit Israel for several months at a time, renting an apartment near the child's habitual resident. Petitioner and Respondent have family members in Israel including Petitioner's mother and Respondent's sister. The Court understands and sympathizes that Respondent's father's health has worsened. He has been ill a number of years. However, as noted in Friedrich II, a removing parent cannot be allowed to remove or retain a child and then complain. Nor is the Court entitled to decide where the child would be happiest since that is an issue for the custody court to decide. Friedrich II, 78 F.3d at 1068. Even the lack of money or educational resources are not determining. Id. at 1068–69. The

child is in no imminent danger nor will she suffer a grave risk of injury from this separation.

Respondent also argues that return of the child to Israel would expose the child to grave risk of harm as Israel is a "zone of war" as contemplated by the Sixth Circuit. Respondent claims this is true because of the "skirmishes" that erupted in Israel resulting from the opening of a tunnel under the Old City of Jerusalem in close proximity to the Al Aksa Mosque (the holiest Muslim shrine in Israel). The newspapers have dubbed this "the worst clashes since 1987–1993 uprising or intifada." (Respondent's Exhibit B). Respondent claims this fighting is not far from her home near the border. The maps and other documents presented to the Court seem to indicate the fighting is from 15 to 90 minutes away from the marital home. The Court notes these "clashes" began Tuesday or Wednesday, September 24 or 25, 1996, after the wrongful removal of the child.

Respondent in her testimony expressed a great deal of anxiety and fear over the recent unrest as well as the ongoing tension in Israel. Respondent testified hearing about random violence such as car and bus bombings. Her testimony was supported by the testimony of her sister, Shoshana Silberstein, who is currently visiting from her home in Israel. Ms. Silberstein testified that she and her husband are contemplating on moving back to the Untied States and that at least one of her children feels the tension of the country.

On the other hand, Professor Rakover, an Assistant Deputy Attorney General in Israel,[5] stated that things were regular and that he had walked to the Western Wall in Jerusalem since the unrest had taken place. He further indicated that although military presence was increased, schools and shops were not closed except for the holidays or for the purpose of demonstrating political views.

The Court would agree that at this time Israel is experiencing some unrest and that this unrest may be in relative proximity to the family's residence. However, the Court does not find sufficient evidence in this record for Israel to be the "zone of war" contemplated by the Sixth Circuit or the Hague Convention. No schools are closed, businesses are open and Petitioner was able to leave the country. It appears that the fighting is limited to certain areas and does not directly involve the city where the child resides.

With respect to Respondent's anxiety and fear about the ongoing tension in the country, it must be noted that she has lived there for a number of years, raised children there for some fourteen years and that her parents have spent extended periods of time there as well. Based on the above, the Court finds the Respondent has failed to establish by clear and convincing evidence that the child, Avital, is in grave risk of physical injury because of the unrest in Israel or that Israel is a zone of war as contemplated by the Hague Convention.

### 2. *Human Rights and Fundamental Freedoms.*

■ Finally, Respondent asserts that the Court should refuse to return the child under Article 20 to protect the mother's rights and freedoms, particularly, her freedom of travel. Article 20 provides:

> The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

Respondent claims that Petitioner has sought and obtained an injunction which prohibits her from leaving Israel until the divorce and custody proceedings are settled. An injunction also limits the child's travel. The exhibits submitted at the hearing indicate the injunction expires September 1997. Respondent claims this injunction potentially affects her ability to see her two other children should she return to Israel without them. The record, including Petitioner's Hearing Exhibit AA, a letter from Petitioner's counsel, Dr. Don I. Frimer in Israel, and the

---

5. Professor Rakover was contacted by the parties' attorneys by telephone on another issue before the Court.

statements of Professor Rakover, indicate that Respondent has a due process right to challenge the injunction. Dr. Frimer claimed such challenge can include an immediate hearing on the merits of the injunction. While Professor Rakover seemed to suggest such proceedings could take up to three months, both agreed such an injunction could be dismissed if the freedom of travel could be secured by a bond. Dr. Frimer and Professor Rakover both noted that freedom to travel "was early on recognized as a right of constitutional character" and was included as a basic right in Israel's "Basic Law: The Dignity of Man and His Freedoms." (Petitioner's Hearing Exhibit AA). This Court is satisfied based on the information received from Professor Rakover, Dr. Frimer and Rabbi Tsevi Weinman (Respondent's counsel in Israel) that Respondent's human rights and fundamental freedoms are not in jeopardy and are protected by the due process available in the civil and Rabbinical courts of Israel.

The Court has focused primarily on Respondent's rights even though it is not clear that the Hague Convention's focus under Article 20 is on the parents' rights as opposed to the child's rights. With respect to the child, Avital, the Court is satisfied that she also has due process rights available to her in Israel in order to challenge her injunction adequately. Avital's human rights and fundamental freedoms, especially the right to travel, are protected. Respondent has not shown by clear and convincing evidence that the return of Avital to Israel would violate the United States' fundamental principles relating to the protection of human rights and fundamental freedoms.

### 3. *One year after retention/abduction.*

Respondent has not met this third affirmative defense since the child only left Israel on June 30, 1996.

### 4. *Consent.*

■ Respondent argues that there is no wrongful removal or retention of the child because Petitioner consented to or acquiesced in the removal of the child "in spite of ongoing marital difficulties and assertions by the mother that she wished to permanently relocate to Michigan." (Respondent's

Brief, p. 4). Consent to or acquiescence in removal are defenses under Article 13a of the Hague Convention. Article 13a provides in part:

> ... the judicial or administrative authority of the requested State is not bound to order the return of the child if the person ... which opposes its return establishes that—
>
> (a) the person ... having care of the person of the child ... had consented to or subsequently acquiesced in the removal or retention.

Petitioner clearly consented to the removal of the child on June 30, 1996 for the summer vacation to visit the grandparents. The return tickets were for August 1, 1996. Petitioner fully expected the child's return. The record, including the testimony of Respondent, suggests that Petitioner's first knowledge of the Respondent's intention to permanently return the child in Michigan was in a telephone call on or about July 17, 1996. In that conversation, he neither consented to nor acquiesced in the retention.

In *Friedrich II, supra,* the Sixth Circuit addressed acquiescence:

> ... we believe that acquiescence under the Convention requires, either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.

*Friedrich II,* 78 F.3d at 1070.

In this case, the judicial proceedings set in motion by the father seeking return of the child occur within days of the extension date of the return airline tickets. Consent to wrongful removal or retention has not been shown here by a preponderance of the evidence. Nor has Respondent shown any evidence rising to a "consistent attitude of acquiescence over a significant period of time." Although the Court is satisfied Petitioner and Respondent has discussed a move back to Michigan, there is no indication on this record Petitioner knew that Respondent intended such a move on June 30 or that she would decide to wrongfully retain the children after vacation. Petitioner has neither

consented to the permanent removal nor acquiesced in the wrongful retention of the child in Michigan by Respondent.

### F. Costs.

Petitioner requests that Respondent pay for the costs relating to this Petition. 42 U.S.C. § 11607(3) states:

> (3) Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

Respondent has not established that payment of court costs, legal fees, and transportation relating to the return of the child is inappropriate. The Court grants Petitioner's request upon submission of the appropriate affidavit and documentation. The imposition of these costs and a fees is not intended to result in the deprivation of any right of the Respondent.

Accordingly,

IT IS ORDERED that Plaintiff's Petition to Return the Minor Child, Avital Freier, to Israel is GRANTED;

IT IS FURTHER ORDERED that the Minor Child be returned to Plaintiff at the offices of Defendant's counsel in Southfield, Michigan, by Monday, October 7, 1996, 9:00 a.m.;

IT IS FURTHER ORDERED that Defendant turn over the Minor Child's passport to her counsel by Wednesday, October 2, 1996, 7:00 p.m.;

IT IS FURTHER ORDERED that Defendant not take the Minor Child outside the counties of Oakland, Macomb and Wayne, Michigan; and

IT IS FURTHER ORDERED that attorney fees and costs, including any additional transportation costs incurred by Plaintiff related to the return of the Minor Child to Israel, be awarded to Plaintiff. Plaintiff is to submit an affidavit and proper documentation as to the attorney fees and costs.

### ORDER SUPPLEMENTING ORDER GRANTING PETITION FOR RETURN OF MINOR CHILD TO ISRAEL

This matter having been brought on by Defendant's Ex Parte Motion for Stay of Order or Modification of Order and Plaintiff's Emergency Motion for Enforcement of October 4, 1996 Order, a hearing having been held at 10:15 a.m. on October 7, 1996, and this Court being otherwise fully advised in the premises:

IT IS HEREBY ORDERED that both Motions are denied.

IT IS FURTHER ORDERED that pursuant to this Court's Order dated October 4, 1996 entitled Order Granting Petition for Return of Minor Child to Israel, that Plaintiff, Jonathan M. Freier shall return with the minor child, Avital, to Tel Aviv, today, October 7, 1996 and continuing to October 8, 1996 according to the following flight plan:

> TWA flight # 220 departing Detroit Metropolitan Airport at 6:10 p.m. arriving JKF International Airport in New York at 7:49 p.m.

> TWA flight # 884 departing JKF International Airport at 9:40 p.m., arriving Tel Aviv on Tuesday, October 8, 1996 at 2:10 p.m.

IT IS FURTHER ORDERED that Defendant, Judith M. Freier is not prohibited from flying on the above flights.