**Yehuda MENECHEM, Petitioner,**

v.

**Lisa FRYDMAN–MENACHEM, Respondent.**

**No. CIV.A.AW–02–1921.**

United States District Court, D. Maryland, Southern Division.

Jan. 14, 2003.

Yehuda Menachem, Jerusalem, Israel, pro se.

Paul T. Stein, Sue Ann Mahaffey, Stein, Sterling, Bennett, De Jong, Driscoll, and Greenfeig, PC, Rockville, MD, for Respondent.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Yehuda Menachem ("Petitioner") petitions this Court to hold that Lisa Frydman–Menachem ("Respondent") has "wrongfully retained" the couple's children within the meaning of the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"). He further asks this Court to remove the children from the custody of Respondent, who resides in Maryland, and to order that the children be returned to the State of Israel in accordance with the International Child Abduction Remedies Act ("ICARA") which is the implementing legislation for the Hague Convention in the United States. *See* 42 U.S.C. §§ 11601–11610. For the reasons stated herein, and after a thorough review of the factual rec-

ord and the legal authority applicable to petitions for the return of wrongfully removed or retained children, the Court finds that, as a threshold matter, the "habitual residence" of the children within the meaning of the Hague Convention is the United States. The children have not, therefore, been "wrongfully retained" in the United States. As Petitioner has failed to establish by a preponderance of the evidence that the children have been "wrongfully retained" within the meaning of the Convention, the Petition will be denied.

## I. FACTUAL AND PROCEDURAL HISTORY

Petitioner is an Israeli citizen who currently resides in Jerusalem, Israel. Respondent, a United States citizen, resides in Montgomery County, Maryland. In December 1992, Respondent met Petitioner in Israel while she was employed at the Jerusalem Post. In April 1994, Respondent became a citizen of Israel. Two months subsequent to that, the two were married in Chicago, Illinois. The couple had two children-who are the subject of this dispute-both of whom were born in Israel. The first child, Noa Rachel, was born on April 15, 1997. The second child, Maya Brianne, was born on May 6, 1999. Both children are citizens of Israel and the United States.

In October 1999, the parties decided to move to Maryland. The parties vehemently dispute the reasons for moving the family to the United States. Petitioner alleges that they decided to move based entirely upon business reasons. Petitioner is the advertising representative for the New York Times and the Washington Post in Israel. In 1998, Petitioner alleges that he came up with an idea to publish an Advertising Supplement related to the events surrounding the start of the new Millennium. Although he would be using his experience from his work in Israel, the project would not have any direct relation to Israel. To facilitate the formation of the project, Petitioner believed he would have to move with his family for two to three years to the United States. Petitioner presents the Court with affidavits from various people who knew the couple before they moved from Israel which, he argues, demonstrate that the couple had no intention of moving permanently to the United States. Petitioner claims that both he and his wife were of one mind about their plans to return to Israel. He attempts to corroborate this assertion with his supporting documentation. Finally, Petitioner asserts, and Respondent does not directly contest, that at the time of the move to Maryland, Respondent had reservations about re-locating the family to the United States.

Respondent has a substantially different view of the rationale behind the family's relocation. Respondent does not dispute that, in part, the family moved in furtherance of Petitioner's goals related to his Millennium project. Respondent alleges, however, that the couple was also motivated by the escalation in violence in Israel. More importantly for present purposes, Respondent denies that the couple had a set plan for return to Israel after a predetermined time period or that the couple always planned to return to Israel to make it their permanent home. She disputes that she ever told other witnesses back in Israel that the couple was only traveling to the U.S. for a limited duration of two to three years. She argues, instead, that the family was moving without a definite framework for when (or if) they would return to Israel. Respondent interprets the move as involving an ongoing assessment, whereby the parties would decide about the future at a later date. Respondent presents supporting documentation and affidavits by which she seeks to show that the parties had no definite or defined

plans about the duration of the relocation to Maryland.

In October 1999, the family moved to a rental home in Friendship Heights, Maryland. They left behind in Israel a house owned by Petitioner, which they rented to another family. Respondent and the two daughters have lived continuously in the United States from that time to the present. The children have never returned to Israel. By 2001, it had become clear that the marriage between the parties was deteriorating. Petitioner claims that at that point his business prospects in the U.S. had diminished and that, as a result, he wished for the family to return to Israel. To that end, he informed Respondent of his desire that the family return to Israel. The record does not clearly show when Respondent decided that she no longer wanted the family to return to Israel. But as early as May 2001, she told Petitioner that due to the deterioration of the marriage and other reasons, she no longer wished for the family to relocate to Israel. Respondent disputes that Petitioner had decided that he wanted to return to Israel in 2001, pointing to evidence that as late as the spring of 2002, the couple were planning their lives in Maryland.

In support of that contention, Respondent alleges two important facts that contradict Petitioner's assertion that the family was planning to return to Israel no later than in 2002. First, towards the end of 2001, the couple began to look to purchase a home in the Montgomery County area. They contacted a realtor to look at properties. Petitioner contends that they decided to purchase a home for purely financial reasons. Specifically, he alleges that the purchase would have been for investment purposes only. Respondent contends, however, that they were seeking a home to continue their lives in the United States.

Beyond looking for homes, the parties also signed a contract with the Charles E. Smith Jewish Day School located in Rockville, Maryland for the academic year 2002–2003. The contract shows that the parties enrolled their daughter Noa in the private school for the upcoming academic year. The couple also enrolled their younger daughter Maya in a pre-school. Petitioner contends that he agreed to sign these contracts for two reasons which, he argues, do not indicate an intention on his part to keep the family in Maryland. First, he believed that if they did not enroll Noa, she would be left without a school if they did not move. Second, he thought that he and Respondent could still work out their marital differences. In either case, he does not seem to dispute that there was a *possibility* that the family would be in Maryland until the Spring of 2003.

The crisis between the parties occurred on April 4, 2002, though again the parties strongly dispute the exact contours of what took place. Petitioner claims that arriving home from work, he had an argument with his wife. He claims that she threatened to sue him to which he responded that he "would destroy her in court." The police were called and the situation was diffused. Respondent agrees that the argument took place, but claims that the Petitioner told her that he would "destroy her at all costs." She also claims that she called the police because she feared for her safety.

On April 5, 2002, Respondent moved with the children to a friend's house. On April 9, 2002, Respondent filed for divorce and sought an order from the Circuit Court for Montgomery County preventing Petitioner from leaving the country with the children. The court granted that order. Subsequent to that filing, Petitioner returned to Israel. He has been back and forth between the two countries at various times since that date. He has now moved

back to Israel on a permanent basis. A custody hearing was held in state court on September 23/24, 2002, and the court granted sole custody rights to Respondent, with visitation rights for Petitioner. Petitioner had moved the court to stay the custody decision pending the outcome of this Court's ruling, but that motion was denied.

On June 6, 2002, prior to the custody hearing but after Respondent's filing for divorce, Petitioner filed his Petition in this Court seeking a return of the children under the Hague Convention. He is currently proceeding *pro se* after his attorneys withdrew on July 24, 2002. On October 31, 2002, the Court held a hearing to address the present Petition. After that hearing, the parties were directed to submit to the Court documentation on the specific issue of whether the Court should proceed from the record or whether an evidentiary hearing was necessary. On November 15, 2002, and in light of the Convention's stated purpose of deciding these cases expeditiously, the Court concluded that the case could be decided on the merits without the need to resort to a full-blown evidentiary hearing. The parties were instructed to submit any supporting affidavits and other evidentiary documentation in support of their respective positions. Up to the current date, both parties have submitted numerous supporting documents.

## II. THE HAGUE CONVENTION

Chapter I of the Hague Convention on the Civil Aspects of Child Abduction states in pertinent part:

Article 1: The objects of the present convention are-

a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

Article 2

Contracting states shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.

Article 3

The removal or the retention of a child is to considered wrongful where-

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

\*    \*    \*    \*    \*    \*

Article 19

A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.

Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 49, 19 I.L.M. 1501 (1980). The Preamble states that it is the intention of the signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the state of their habitual residence . . . ." Hague Convention, Preamble, 19 I.L.M. 1501(1980).

The United States became a signatory to the Convention when Congress enacted

ICARA. Finding that "the international abduction or wrongful retention of children is harmful to their well being," Congress granted courts the authority to promptly return children wrongfully removed or retained within the meaning of the Convention. *See* 42 U.S.C. § 11601. This Court derives its jurisdiction to hear the Hague Petition from ICARA. *Id.* at § 11603(a) (granting concurrent jurisdiction to state and federal courts).

■ "The primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" *Miller v. Miller,* 240 F.3d 392, 398 (4th Cir.2001)(quoting *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993)("*Friedrich I*")). *See also Feder v. Evans–Feder,* 63 F.3d 217, 221 (3rd Cir.1995)("[The Convention] is designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child and aims to protect the legal custody rights of the non-abducting parent."); *Shalit v. Coppe,* 182 F.3d 1124, 1127 (9th Cir.1999). The statute is clear that courts should not inquire into the underlying merits of the custody dispute. To the contrary, "'the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence.'" *Miller,* 240 F.3d at 398 (quoting *Ohlander v. Larson,* 114 F.3d 1531, 1541 (10th Cir. 1997)); *Delvoye v. Lee,* 224 F.Supp.2d 843, 847 (D.N.J.2002). The Court is therefore instructed to determine only the more narrow issue of whether Petitioner has shown that the children have been "wrongfully

retained". *See Feder,* 63 F.3d at 221; *Escaf v. Rodriquez,* 200 F.Supp.2d 603, 611 (E.D.Va.2002).[1] The determination of custody is "made by the proper court or authorities of the country where the child habitually resides." *In re Rodriguez v. Rodriguez,* 33 F.Supp.2d 456, 458 (D.Md. 1999).

■ Petitioner has the burden of establishing by a preponderance of the evidence that the children have been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 1603(e)(1)(A). Petitioner must prove that: (1) the children were "habitually resident" in Israel at the time of the alleged wrongful retention; (2) the wrongful retention was in breach of Petitioner's custody rights under the laws of the state of the children's habitual residence; and (3) Petitioner was exercising those custody rights at the time of the retention. *See Miller,* 240 F.3d at 398; *Bocquet v. Ouzid,* 225 F.Supp.2d 1337, 1340–41 (S.D.Fla.2002). Thus, as a threshold matter, Petitioner must establish that the habitual residence of the children was Israel prior to them being allegedly wrongfully retained in Maryland. *See Feder,* 63 F.3d at 222.[2] If the Court holds that Petitioner has failed to establish that the habitual residence of the children was Israel, then it must conclude that there was no "wrongful retention" within the meaning of the Convention. *See, e.g., Falls v. Downie,* 871 F.Supp. 100 (D.Mass.1994); *New York ex rel. Ron v. Levi,* 279 A.D.2d 860, 862–3, 719 N.Y.S.2d 365, 367 (N.Y.App.Div.2001)(affirming a lower court's holding that the Hague Con-

---

1. "[T]he focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather, it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country different from the child's habitual residence and, if so, whether

any of the Convention's defenses apply to bar the child's return to his habitual residence." *Escaf,* 200 F.Supp.2d at 611.

2. For purposes of the present motion, the Court concludes that the date of the alleged wrongful retention was April 4, 2002.

vention was inapplicable "due to petitioner's failure to establish that, at the time respondent allegedly wrongfully retained the children in the United States, they were, in fact, 'habitual resident[s]' of Israel within the meaning of the Hague Convention").

## III. PROCEDURE UNDER THE HAGUE CONVENTION AND ICARA

■ Neither ICARA nor the Hague Convention specifically dictate how courts are to proceed when considering a petition under the Treaty. *See Zajaczkowski v. Zajaczkowska,* 932 F.Supp. 128, 130 (D.Md.1996). "Unquestionably at the heart of the Convention is prompt action by the Courts." *Id.* With that specified interest in mind, the Court must answer the preliminary question of whether the Court can proceed from the pleadings alone or whether it must hold an evidentiary hearing to decide the merits of the case. The Court finds that in a case such as this one, where an evidentiary hearing would not serve to aid the Court in its decision, it can move to decide the merits without an evidentiary hearing. The Court further holds that when, as here, there are no genuine issues of material fact in dispute and that the case is ripe for decision as a matter of law, summary judgment is the appropriate vehicle for deciding the case in a prompt and expeditious manner, consistent with the purposes of the Convention.

Petitioner has argued that the Court should not proceed without first holding a full-blown evidentiary hearing during which witnesses could be brought to testify and be cross-examined on the pertinent legal issues. Although many courts do, in fact, hold evidentiary hearings before deciding the merits of the petition, Petitioner cites to neither any part of the treaty nor any case law which states that an evidentiary hearing and the opportunity to present oral testimony are required in all

cases. And, in fact, the Convention, with its emphasis on speediness, might be particularly well-suited for summary judgment in appropriate cases. In *March v. Levine,* 249 F.3d 462 (6th Cir.2001), the Sixth Circuit Court of Appeals affirmed the lower court's granting of summary judgment because, among other things, the appellate court agreed with the trial court that the procedure in summary judgment aligned with the Treaty's interest in the expeditious treatment of the petitions. As the lower court stated:

> [T]his type of case is appropriate for resolution by summary judgment. Indeed, the language of the Convention supports resolution by such means. Article 11 provides that a court, when faced with a petition under the Convention, should 'act expeditiously in proceedings for the return of children.' Courts are to place these cases on a 'fast track' in order to expedite these proceedings and carry out the purposes of the Convention .... There is no requirement under the Hague Convention or under the ICARA that discovery be allowed or that an evidentiary hearing be conducted. Thus, under the guidance of the Convention and the statutory scheme, the Court is given authority to resolve these cases without resorting to a full trial on the merits or a plenary evidentiary hearing.

*March v. Levine,* 136 F.Supp.2d 831, 833–34 (M.D.Tenn.2000) (citations omitted). Reviewing the history of the Convention, and also the treatment of Hague Petitions in other countries, the appellate court held that "given the unique nature of this treaty," the district court did not abuse its discretion in granting summary judgment without a hearing. *See March,* 249 F.3d at 475.

The Court agrees with the aforementioned analysis and adopts it here. The

Court need not comment on whether summary judgment will always be appropriate as there may be cases where disputed issues of fact make such a determination more difficult. But in this case, the Court believes that it would be acting consistent with the notion that it should act expeditiously by proceeding to the merits of the case without holding an evidentiary hearing. The Court essentially agrees with Respondent who has argued that an evidentiary hearing is not warranted and that the record before the Court is sufficient for the Court to make its determination. The Court repeats that both parties have had ample opportunity to supplement the record with supporting documentation. As a result, the record is replete with affidavits and other supporting documents which give the Court all the facts it needs to rule on the present motion. Considering the voluminous documentation and materials supplied to the Court, the Court believes that an evidentiary hearing would simply serve to rehash all the issues already presented and would not provide the Court with any additionally helpful or probative evidence.

The Court notes that no party in this case has formally moved the Court to grant summary judgment and that, therefore, it will be granting summary judgment *sua sponte.*[3] "While Fed. R. Civ. Proc. 56 does not expressly provide that district courts may enter summary judgment *sua sponte,* there can be little doubt that the district courts inherently possess the power." *United States Development Corp. v. Peoples Fed. Savings & Loan Assoc'n.,* 873 F.2d 731, 735 (4th Cir.1989)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91

L.Ed.2d 265 (1986)). The power is contingent upon the district court giving notice to the parties so that they may come forward to defend their claims at that stage. *Id.* "While the notice need not necessarily be a formal document, it should provide the full ten days called for by Fed. R. Civ. Proc. 56(c)." *Id.* (citations omitted). By an Order dated November 15, 2002, the Court explicitly notified the parties that it would be ruling from the record before it and invited each side to submit further material in support of each's arguments.

## IV. ANALYSIS: HABITUAL RESIDENCE

■ As previously noted, Petitioner must prove by a preponderance of the evidence that the habitual residence of the children was Israel at the time when Respondent allegedly wrongfully retained them in Maryland. Petitioner's argument is that although the family moved from Israel to the United States for an extended period of time, the children's habitual residence has always been Israel. Petitioner contends that the relocation to Maryland was meant to be for a definite and temporary time period. Respondent counters that even if the children originally were habitually resident in Israel, in the two and a half years that they have lived in Maryland, their habitual residence changed to Maryland. Finding that there is no genuine issue of material fact in dispute as pertains to the children's habitual residence and that the children habitually resided in Maryland, the Court holds that as a matter of law Respondent did not "wrongfully retain" the children in Mary-

---

**3.** While there was no formal Motion for Summary Judgment, at oral argument Respondent indicated that she believed that such an approach was appropriate and that the matter was ripe for decision without resort to an evidentiary hearing. Petitioner was present for that motions hearings via telephone and the Court has given him a full and adequate opportunity to both argue to the Court why an evidentiary hearing is warranted and also the merits of his case.

land within the meaning of the Hague Convention.

The Hague Convention does not define "habitual residence." *See Miller*, 240 F.3d at 400. In determining the habitual residence of children, the Fourth Circuit Court of Appeals has stated that " 'there is no real distinction between ordinary residence and habitual residence.' " *Id.* (quoting *Friedrich I*, 983 F.2d at 1401). This Court is instructed to determine the children's customary residence prior to the removal or retention. *See Fawcett v. McRoberts*, 168 F.Supp.2d 595, 600 (W.D.Va.2001). The Court must look back in time, not forward. *Miller*, 240 F.3d at 400 (quoting *Friedrich I*, 983 F.2d at 1401). It is a fact specific inquiry that should be made on a case-by-case basis. Additionally, for purposes of the Convention, a child can have only one habitual residence. *See id.*

In the case before the Court, the habitual residence of the children at the time of their birth, and immediately thereafter, was Israel. The essential and dispositive factual finding for this Court to determine is whether in the time the children have now resided in the United States, their habitual residence has changed from Israel to the United States. If, as Petitioner suggests, the children's habitual residence remained Israel, then it would be possible to analyze further the Petitioner's claim of "wrongful retention." If, however, the habitual residence of the children changed from Israel to the United States, then they could not have been "wrongfully retained" in this country.

The matter is made more complex by the fact that the children are currently five and three years of age. The *Miller* court referenced that habitual residence could be equated with ordinary residence. *Miller*, 240 F.3d at 400. Other courts have noted, however, that young children are often incapable of changing their habitual residence of their own volition. Instead, their residence changes in accordance with the settled intent of their parents. *See Delvoye*, 224 F.Supp.2d at 848. Those courts have indicated that with young children, a court's central focus should be on the parental intentions and that less emphasis should be placed on the factual circumstances of the child (i.e., acclimatization to the new environment, ties to the community, etc.). *See Mozes v. Mozes*, 239 F.3d 1067, 1078–79 (9th Cir.2001); *Tsarbopoulos v. Tsarbopoulos*, 176 F.Supp.2d 1045, 1049 (E.D.Wash.2001). While such admonitions are well taken, and courts should analyze the intentions of the parents, a court can not lose sight of the fact that the focus of the Convention is on the child. While the intent of the parents is therefore clearly relevant, the factual circumstances attendant to the life of the child are equally important and relevant. The Third Circuit Court of Appeals has lucidly stated the dual-pronged nature of the inquiry:

> Guided by the aims and spirit of the Convention ... we believe that a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there.

*Feder v. Evans–Feder*, 63 F.3d 217, 224 (3rd Cir.1995).

Cases which deal with the question of whether a child's habitual residence has changed form the original State to a new State fall generally (if amorphously) into two camps. On the one hand, in certain

cases it is apparent from either the length of the time in the new State (and the child's acclimatization to it) and from the intentions of the parents, that a young child's habitual residence has changed to the new State. *See Feder,* 63 F.3d at 224 (the circumstances of a child who had spent six months in Australia led to the conclusion that he was habitually resident there); *Falls v. Downie,* 871 F.Supp. 100, 102 (D.Mass.1994); *Slagenweit v. Slagenweit,* 841 F.Supp. 264, 269 (N.D.Iowa 1993)(noting the child's acclimatization with the Iowa community in finding it to be her habitual residence); *Walton v. Walton,* 925 F.Supp. 453, 457–8 (S.D.Miss. 1996); *March v. Levine,* 136 F.Supp.2d 831, 839 (M.D.Tenn.2000)(holding the children's habitual residence to be Mexico after just one year of continuous residence there because the children had become incorporated into their new community); *Roszkowski v. Roszkowska,* 274 N.J.Super. 620, 635, 644 A.2d 1150, 1158 (Ch.Div.1993)(holding that even though the child was born in Poland, and had lived most of his life there, his habitual residence had changed to New Jersey after 6 months); *New York ex rel. Ron v. Levi,* 279 A.D.2d 860, 862–3, 719 N.Y.S.2d 365, 367 (N.Y.App.Div.2001)(affirming a lower court finding that after two years in the United States, the habitual residence had changed from Israel to the U.S.).

In other cases, the facts demonstrate that either because of the brevity of the stay in the new State or because of the clear intent of the parents for the trip to be temporary, the habitual residence did not change despite the geographical location of the child in the new State. *See Freier v. Freier,* 969 F.Supp. 436, 440 (E.D.Mich.1996)(rejecting a mother's arguments that after two months the children called Michigan their home, the Court found that habitual residence to be Israel because the children were born there and had lived nearly their entire lives there);

*McKenzie v. McKenzie,* 168 F.Supp.2d 47, 50 (E.D.N.Y.2001)(holding that the child's ties to her previous country of residence, Germany, combined with the parents' unclear intentions to settle in the U.S. led to a finding of Germany as a habitual residence); *Tsarbopoulos v. Tsarbopoulos,* 176 F.Supp.2d 1045, 1055 (E.D.Wash. 2001)(lack of acclimatization with Greece and no settled intent of the part of the parents to relocate meant that the habitual residence of the U.S. had not been abandoned). In the most obvious cases, it is strikingly evident that the habitual residence has not changed because the child is clearly removed from one residence by a parent in order to establish new custody rights over the child in the new State. In these cases, the habitual residence will not have changed despite one parent's intent to change it. *See Miller,* 240 F.3d at 400; *Fawcett v. McRoberts,* 168 F.Supp.2d 595, 600 (W.D.Va.2001)("Other than taking vacations with his family, Travis lived his entire life in Scotland prior to the date of his removal .... Because the evidence clearly demonstrates that Travis continuously resided in Scotland from the time of his berth to the date of removal, the Court holds that he was 'habitually resident' in Scotland for purposes of the Hague Convention."); *Escaf v. Rodriquez,* 200 F.Supp.2d 603, 612 (E.D.Va.2002).

In applying the legal doctrines enunciated by the many courts that have analyzed the question of "habitual residence", and in paying heed to this Circuit's exposition of the issue in *Miller,* the Court holds that the habitual residence of the children changed from Israel to Maryland. There has, therefore, been no "wrongful retention" in Maryland within the meaning of the Hague Convention. *Miller* instructs courts to look back in time, not forward. The evidence leads to only one rational conclusion, namely that after two and a half years of continuous residence here in

the United States, it is beyond dispute that the children are no longer habitually resident in Israel.[4]

Petitioner's main contention is that the parties had an agreed-upon intent to move back to Israel after a set amount of time. He argues that the relocation was for a limited duration, based upon his business opportunities here in the United States. He submits numerous affidavits which indicate that it was the parties' understanding that they would always return to Israel. While the affidavits point in one direction, there are a number of factors which undercut his argument.

Respondent disagrees that they ever agreed upon moving for only a limited time. Rather, she argues that they planned to move for an indefinite period after which they would assess their living situation. Two undisputed pieces of evidence corroborate the idea that they had no definite plans to return to Israel at any set time. First, the parents enrolled both children in private schools for the academic year 2002–2003. Petitioner argues that this does not undermine his argument because it was just a back-up plan in case they did not move back. But it is clear then that he at least envisioned the children being in the United States until the spring of 2003. Furthermore, by the end of 2001, the couple were looking to purchase a home in Maryland. Petitioner again argues that the idea to purchase a home was based upon investment purposes and had nothing to do with intentions to remain in Maryland. But the fact that they were looking at a home, and had enrolled their daughters in school, leads to the inference that they had no set plans to return to Israel in Spring 2002.

At the very most, then, Petitioner has shown that there was a possible intention to return to Israel at some time. But it is clear that at a certain point in time, his wife no longer shared that intention. And furthermore, the outward manifestations indicate that at the very least, they had plans to stay in Maryland for an indefinite period. But above and beyond the fact that Petitioner may have had some intention to return with the family to Israel, it is not enough to overcome the overwhelming fact that the children had continuously and physically resided in Maryland for over two and a half years at the time of the allegedly wrongful retention.

The Fourth Circuit has stated that a child can have only one habitual residence. *See Miller,* 240 F.3d at 400. It would stretch the meaning of "habitual residence" to the limits of comprehension were this Court to find that the children's habitual residence was Israel. Since October 1999, they have known only Maryland as their home. The younger daughter was 7–months–old when the family moved. Now, she is more than three years old and would have no memories of Israel. Since their arrival in the United States, it is undisputed that the children have not returned to Israel even one time. In sum, while any ties they might have had to Israel have indisputably faded over time, their ties to the United States would have fortified over all these years of residence. If courts are meant to interpret "habitual residence" to mean "customary residence", then the children's customary residence is Maryland.

The Court finds support in its conclusions by looking to the purposes of the Treaty. First, the Treaty was enacted to keep parents from escaping with their children to other states in the hope of finding a more sympathetic forum for a custody battle. In this case, there was no "abduction" as the word is used in the statute.

---

4. The Court has measured the two and a 1/2 years from the date of entry to the United States (October 1999) until the date of the alleged wrongful retention (April 2002).

Nor is this the case where a parent took a child on a pretextual "vacation" only to seek custody over the child in the foreign courts while the non-abducting parent was home in the place of the child's habitual residence. In fact, were this Court to grant the Petition, it would be acting in direct contravention of the Treaty by having the custody battle decided by courts outside the State of the children's habitual residence.[5]

In addition, the idea behind the statute is to preserve the *status quo*. The *status quo* in this case, in light of the children's nearly two and a half years in the United States, must be Maryland. If the Court granted the Petition to return the children to Israel, it would serve to dramatically disrupt the *status quo* by sending the children to an entirely new home. The reason a court should be wary of sending children out of a country where they have resided for over two years is because of the inevitable ties that the child will form with that forum. That the children could hypothetically become re-acclimated to Israel were the Court to return them is plainly irrelevant.[6]

A review of the case law shows that courts faced with children with even less exposure to the new State have still held that the habitual residence has changed. In *March*, for example, the father had won custody of the children in Tennessee and then moved with his children to Mexico. The children had spent their entire lives in Tennessee (and no time in Mexico) except for one year, the year prior to being abducted by their maternal grandparents. See *March*, 136 F.Supp 2d at 838–39.

Even though the children had been in Mexico for only one year, the Court found that the habitual residence had changed. *Id.* The Court emphasized that the children had enrolled in school and had acclimatized to the new environment in finding that their habitual residence had changed. *Id.*

Similarly, in *Feder*, the district court had found that the child had retained residence in the United States despite relocating for six months to Australia. *See Feder v. Evans–Feder*, 63 F.3d 217 (3rd Cir. 1995). Even though the child had only been in the new State for six months, the appellate court reversed the district court, holding that the habitual residence had in fact changed to that of Australia. In finding that the habitual residence had changed, the Court noted:

> Evan moved, with his father and mother, from Pennsylvania to Australia where he was to live for at the very least the foreseeable future, and stayed in Australia for close to six months, a significant period of time for a four-year old child. In Australia, Evan attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life. Although Mr. and Mrs. Feder viewed Australia very differently, both agreed to move to that country and live there with one another and their son, and did what parents intent on making a new home for themselves and their child do-they purchased and renovated a house, pursued interests and

---

**5.** The Court stresses again that in making its decision, it makes no finding whatsoever about the merits of the underlying custody dispute. Both parties have argued at length about each other's fitness as parents. Specifically, they have made allegations about the other's actions *vis-a-vis* the children. All of those arguments have no relevance to the issues presented in the Petition.

**6.** Congress enacted ICARA with the intentions of preventing the "harmful effects" of wrongful abduction or retention. To grant this Petition would likely *cause* those "harmful effects", rather then serving to prevent them.

employment, and arranged for Evan's immediate and long-term schooling. *Feder,* 63 F.3d at 224. In this case, the children have stayed in the United States for *five times* as long as the child in *Feder.* The parents also enrolled their children in local schools, creating ties with the local community. This case is even stronger for a finding that the habitual residence of the children changed over the years that they were resident in Maryland.

The cases where courts have found that the habitual residence had *not* changed are distinguishable from the case at bar. For example, this is not a case where one parent stole off in the night, removing the child to a new jurisdiction. In *Fawcett,* the child was born and had resided his whole life in Scotland. *See Fawcett,* 168 F.Supp.2d at 597. In the midst of a divorce and custody battle that was taking place in the Scottish courts, the father unlawfully removed the child from the Scottish jurisdiction and moved the child to the United States-resulting in the father being held in contempt. In determining the habitual residence of the child, the district court in Virginia held that the child's habitual residence was clearly Scotland, and that one parent could not unilaterally change it by moving the child to a new country. *See id.* at 600.

Likewise, in *Escaf,* the child lived his entire life in Colombia. *See Escaf,* 200 F.Supp.2d at 607. After the divorce of the parents in Colombia, the father moved to the United States. The couple arranged for the son to visit his father in the U.S. (after two previous visits had passed without incident). On the third trip, the father informed the mother that he was keeping the son in his custody and not returning the child to Colombia. The court held that the trip to the U.S. was of a specific duration and that only one of the parents had changed intentions. The child's habitual residence remained Colombia. *See id.* at 612.

The Court understands that each petition brought under the Hague Convention will have its own fact-specific nature. But the Court has the broad support of the case law in finding that after thirty-one months in one country, the habitual residence of the children will be that country.[7] Two and a half years is a significant and appreciable amount of time during which a child will make new ties to his or her home. This would appear to be the law in not just the United States but in other countries as well: "[I]t would appear that any residence over twelve months will be deemed to be habitual." [8]

---

**7.** In one recent decision, a district court held that a child's habitual residence had not changed from the United States to Greece despite 27 months of presence in Greece. *See Tsarbopoulos v. Tsarbopoulos,* 176 F.Supp.2d 1045 (E.D.Wash.2001). The Court based its opinion upon the child's limited exposure to Greece and upon the parent's unsettled intentions to abandon the United States. But other important factors serve to distinguish that case from the present one. First, the *Tsarbopoulos* court found evidence of physical and verbal abuse that might have played a role in the move from the United States. This factor weighed against a finding that the mother intended to abandon her home in the United States. *See id.* at 1056–57. Second, the Court specifically found that the children had

not acclimatized to Greece-a showing that is lacking here.

**8.** Paul R. Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 106 (Oxford Univ. Press 1999). Beaumont argues that law from the United States, Australia and New Zealand indicates that six months and above will suffice to change a habitual residence. *See id.* In a footnote, Beaumont cites with skepticism to an English case where the Court found that despite eight months in England, the habitual residence of the child had not changed from Israel to England. *Id.* at 107, n. 121 (citing *Re. S. (Minors)(Abduction: Wrongful Retention)*[1994] Fam. 70).

## V. CONCLUSION

Having determined that Petitioner has failed to establish by a preponderance of the evidence that the children were habitually resident in Israel at the time of the allegedly wrongful retention, and having found, *a fortioiri*, that the children were not "wrongfully retained" in Maryland within the meaning of the Hague Convention, as implemented in the United States by ICARA, the Petition will be DENIED. An Order consistent with this Opinion will follow.